

# Fourth Court of Appeals

## San Antonio, Texas

## MEMORANDUM OPINION

No. 04-16-00413-CV

**IN THE INTERST OF D.D.L.R. and D.D.L.R., Children**

From the 45th Judicial District Court, Bexar County, Texas
Trial Court No. 2015PA01025
Honorable Lisa Jarrett, Judge Presiding[1]

Opinion by:    Patricia O. Alvarez, Justice

Sitting:        Karen Angelini, Justice
                Patricia O. Alvarez, Justice
                Jason Pulliam, Justice

Delivered and Filed:  November 23, 2016

AFFIRMED

Appellant E.D.L.R. appeals the trial court's order terminating his parental rights to his children, DAN and DAR.[2]  In his only issue on appeal, E.D.L.R. asserts the evidence was neither legally nor factually sufficient for the trial court to find, by clear and convincing evidence, that terminating his parental rights was in his children's best interests.  We conclude the evidence is both legally and factually sufficient, and we affirm the trial court's order.

---

[1] This proceeding arises out of Bexar County trial court cause No. 2015-PA-01025, styled *In the Interest of D.D.L.R., et al., Children*, pending in the 45th Judicial District Court, Bexar County, Texas, the Honorable Stephani Walsh presiding.

[2] Because both children share the same initials, D.D.L.R., for purposes of this opinion, the child born April 20, 2001 will be referred to as DAN, and the child born April 28, 2005, will be referred to as DAR.

**FACTUAL AND PROCEDURAL BACKGROUND**

On May 4, 2015, the Texas Department of Family and Protective Services received a referral—for emotional abuse of DAR by E.D.L.R. On May 13, 2015, the Department received a second referral—for physical abuse of DAR by E.D.L.R. asserting that "E.D.L.R. would hit DAR." The following day, on May 14, 2015, law enforcement contacted the Department from the family's residence. DAN called 911 alleging that E.D.L.R. was "exposing his penis, 'jacking off' while watching porn and saying derogatory things to children." The children and their mother left the residence and stayed with a relative.

On May 15, 2015, the Department received a third referral—for neglectful supervision of DAR by her mother. Ten-year-old DAR apparently located a baggie containing a white crystal substance and ate the substance. DAR's mother, A.D.L.R., told DAR that the substance was cocaine and methamphetamine, but instructed the child not to tell anyone.

The Department interviewed DAR at her school. Many of the allegations, in much greater detail, were repeated by the child. DAR was released from school at 2:45 p.m. that same day; however, no adult came to pick her up. The Department was granted exigent removal authority and the children were taken in the Department's custody.

On May 18, 2015, the Department filed its Original Petition for Protection of a Child, for Conservatorship, and for Termination in Suit Affecting the Parent-Child Relationship. Service plans were created for both A.D.L.R. and E.D.L.R. Additionally, status hearings and permanency hearings were conducted before the trial court.

On June 15, 2016, after several permanency hearings and a bench trial on the merits, the trial court terminated E.D.L.R.'s parental rights to DAN and DAR based on (1) subparagraphs (N) and (O) of section 161.001(b)(1), *see* TEX. FAM. CODE ANN. § 161.001(b)(1)(N), (O) (West Supp.

2016), and (2) a determination that such termination was in the children's best interests, *see id.* § 161.001(b)(2).[3]

E.D.L.R. does not challenge the trial court's findings concerning the statutory grounds for involuntary termination of his parental rights. *See id.* § 161.001(b)(1); *see also In re J.F.C.*, 96 S.W.3d 256, 261 (Tex. 2002). Instead, he argues the trial court erred because the evidence was neither legally nor factually sufficient for the court to find, by clear and convincing evidence, that terminating his parental rights was in his children's best interests. *See* TEX. FAM. CODE ANN. § 161.001(b)(2); *J.F.C.*, 96 S.W.3d at 261.

## SUFFICIENCY OF THE EVIDENCE

### A. Standard of Review

"Involuntary termination of parental rights involves fundamental constitutional rights and divests the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except for the child's right to inherit from the parent." *In re L.J.N.*, 329 S.W.3d 667, 671 (Tex. App.—Corpus Christi 2010, no pet.) (citing *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985)). As a result, appellate courts must strictly scrutinize involuntary termination

---

[3] Texas Family Code sections 161.001(b)(1)(N), (O) provide as follows:

    (N) constructively abandoned the child who has been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services for not less than six months, and:

        (i) the department has made reasonable efforts to return the child to the parent;

        (ii) the parent has not regularly visited or maintained significant contact with the child; and

        (iii) the parent has demonstrated an inability to provide the child with a safe environment; [and]

    (O) failed to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain the return of the child who has been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services for not less than nine months as a result of the child's removal from the parent under Chapter 262 for the abuse or neglect of the child. . . .

TEX. FAM. CODE ANN. § 161.001(b)(1)(N), (O).

proceedings in favor of the parent. *Id.* (citing *In re D.S.P.*, 210 S.W.3d 776, 778 (Tex. App.—Corpus Christi 2006, no pet.)).

An order terminating parental rights must be supported by clear and convincing evidence that (1) the parent has committed one of the grounds for involuntary termination as listed in section 161.001(b)(1) of the Family Code, and (2) terminating the parent's rights is in the best interest of the child. *See* TEX. FAM. CODE ANN. § 161.001; *J.F.C.*, 96 S.W.3d at 261. "There is a strong presumption that the best interest of the child is served by keeping the child with its natural parent, and the burden is on [the Department] to rebut that presumption." *In re D.R.A.*, 374 S.W.3d 528, 533 (Tex. App.—Houston [14th Dist.] 2012, no pet.). "The same evidence of acts or omissions used to establish grounds for termination under section 161.001(b)(1) may be probative in determining the best interest of the child." *Id.*

When a clear and convincing evidence standard applies, a legal sufficiency review requires a court to "look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *In re J.L.*, 163 S.W.3d 79, 85 (Tex. 2005) (quoting *J.F.C.*, 96 S.W.3d at 266). If the court "determines [a] reasonable factfinder could form a firm belief or conviction that the matter that must be proven is true," the evidence is legally sufficient. *See id.* (quoting *J.F.C.*, 96 S.W.3d at 266).

Under a clear and convincing standard, evidence is factually sufficient if "a factfinder could reasonably form a firm belief or conviction about the truth of the State's allegations." *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002); *accord In re K.R.M.*, 147 S.W.3d 628, 630 (Tex. App.—San Antonio 2004, no pet.). We must consider "whether disputed evidence is such that a reasonable factfinder could not have resolved that disputed evidence in favor of its finding." *J.F.C.*, 96 S.W.3d at 266; *accord C.H.*, 89 S.W.3d at 25.

We next turn to the trial court's finding that termination was in the children's best interests.

**B.      Evidence Regarding the Best Interests of the Children**

Applying the applicable standards of review for sufficiency of the evidence, we examine all the evidence, *see J.F.C.*, 96 S.W.3d at 266; *see also City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005) (crediting or disregarding evidence), and recite below the evidence that especially pertains to the *Holley* factors, *see Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976).  The trial court heard live testimony from multiple witnesses, including E.D.L.R. and the children's mother, A.D.L.R., and arguments from the Department's attorney, the children's attorney ad litem, and counsel for E.D.L.R.

Because the only issue before this court is the termination of E.D.L.R.'s parental rights, we limit our recitation of the facts accordingly.

*1.      A.D.L.R., the Children's Mother*

After the matter was called for trial, A.D.L.R. met with her attorney and voluntarily relinquished her parental rights.  A.D.L.R. affirmed her belief that the children could not receive the necessary help in her care and further testified that she does not believe the children should be returned to their father, E.D.L.R.  According to A.D.L.R., "He's just mentally unstable . . . He's not a good role model.  He's not—he's not that healthy right now."  Although not a psychiatrist, A.D.L.R. testified that it was her understanding that E.D.L.R. had been diagnosed with schizophrenia.  As to his behaviors, A.D.L.R. described E.D.L.R. talking and laughing to himself.  She further testified to E.D.L.R.'s violent behavior.

*2.      Debra Coltman, Licensed Professional Counselor*

Debra Coltman, DAR's counselor, testified regarding DAR's present mental situation.  When DAR was admitted to Devereux, the facility in which the Department placed her, she presented with symptoms of severe mental, physical, and sexual abuse.  DAR was further

diagnosed with Post Traumatic Stress Disorder in connection with the domestic abuse she witnessed in the home. In addition to the sexual abuse and witnessing E.D.L.R. physically abuse her mother, DAR described E.D.L.R. as schizophrenic and relayed that she was afraid of him. Although the employees at Devereux attempted to maintain parent-child contact by telephone, many of the conversations ended with DAR upset and emotional. E.D.L.R. was verbally and emotionally abusive. Debra relayed that DAR was particularly upset after a conversation with E.D.L.R. wherein DAR asked about her mother and E.D.L.R. responded, "I don't know. I don't know if she's dead or alive."

Debra further testified that, the day before trial, DAR "did not think it was a good thing for her to have contact with E.D.L.R.," even via telephone. On cross-examination, Debra conceded that, like other victims of domestic abuse, DAR vacillates between wanting to be with her parents and never wanting to see them again. "They are the only parents she has ever known or loved." During April 2016, DAR attempted to hurt herself several times; Debra conducted four suicidal risk assessments because DAR was "telling people at school she wanted to kill herself." At one point, DAR attempted to tie her backpack around her neck and strangle herself. Finally, Debra opined that DAR's special needs cannot be met under E.D.L.R.'s care.

*3.       Joshua Garcia, Parent Educator for Children's Shelter Compadre Program*

Joshua Garcia testified regarding E.D.L.R.'s participation in the Compadre y Compadre program, a fifteen-session program designed to teach parenting skills to men. Joshua testified that he met E.D.L.R. on one occasion, but contrary to E.D.L.R.'s assurances that he attended many classes, Joshua testified that E.D.L.R. never returned after their initial meeting. More specifically, E.D.L.R. did not complete the program. Joshua testified that E.D.L.R. expressed that he did not need to attend the class; and, after several unsuccessful attempts by Joshua to have E.D.L.R. attend sessions, E.D.L.R. was discharged from the program.

### 4. E.D.L.R., the Children's Father

The next witness, E.D.L.R., testified telephonically. He acknowledged a criminal history including three DWIs and a felony possession charge. E.D.L.R. explained that he was not in court because he was having difficulty with his leg—"sometimes his calf pulls in the morning and it makes it painful to walk." This testimony was questioned during later testimony when E.D.L.R.'s mother, the children's grandmother, testified that when she left the house that morning she expected E.D.L.R. to be meeting her at the courthouse. According to the children's grandmother, E.D.L.R. was not present because he "pulled a muscle" in his leg.

E.D.L.R. acknowledged that a service plan was created in May of 2015. He contended, however, that no one explained that he needed to complete the services contained within the plan to have his children returned. To the contrary, E.D.L.R. testified that he understood he only needed to "start taking classes." To that end, E.D.L.R. testified that he attended some classes at Lifetime Drug Recovery, Texas Psychological consultation, and Compadre y Compadre. None of these programs, however, were satisfactorily completed. E.D.L.R.'s testimony that the caseworker told him that he only had to "start taking classes" was also contradicted by later witnesses. Both the children's grandmother and the caseworker testified that E.D.L.R. was specifically told that he had to complete the designated classes.

E.D.L.R. also testified he had not appeared for previous court hearings "because they haven't notified me of any." E.D.L.R. blamed his lack of attendance at the classes on lack of transportation and poor health. He asserted that he completed as much as he could—"I had transportation problems. I had health problems. I have blood pressure. My leg, I have a bad leg. My calf muscle pulls, and I would have to walk. I don't have a vehicle." Additionally, E.D.L.R. contended that his caseworker never returned his phone calls.

Finally, E.D.L.R. denied that DAR was afraid of him and adamantly asserted that he never laid a hand on A.D.L.R. However, during cross-examination, E.D.L.R. acknowledged that he was, in fact, convicted of assaulting A.D.L.R.—"I grabbed her by the arm or by the hair or something. That was the only time."

     *5.     Shameka Atkins, Texas Department of Family and Protective Services Caseworker*

Shameka testified that the children were brought into the State's care for neglectful supervision, sexual abuse, and physical abuse in May of 2015. She became their caseworker approximately two months later. Shameka testified that family service plans were developed. Shameka further testified that she continually made efforts to assist E.D.L.R. with obtaining services; more specifically, for each of the services contained within the service plan, Shameka located services that were close to E.D.L.R.'s residence so that transportation would not be an issue. Shameka also testified that she personally spoke to E.D.L.R.; she explained about the services several times and the consequences of his not complying with the service plan. Shameka explained that E.D.L.R. originally told her that he was not going to do any services, explaining "Nobody's going to take my kids. I've been raising them. They've been living with me." She described E.D.L.R. as irate throughout the proceedings; after several months, he was still cursing at her and hanging up on her.

In November 2015, Shameka relayed that E.D.L.R. changed his mind and registered for the Compadre program. After the first session, however, E.D.L.R. told her that he was not going to return. According to E.D.L.R., "he did not need parenting classes, he's already been raising his kids." Ultimately, E.D.L.R. only engaged in two of the services on the service plan; he completed a drug assessment and a psychological assessment. E.D.L.R., however, failed to submit to the required urinalysis testing, attend the individual counseling, attend parenting classes, or attend domestic violence classes.

Shameka explained that she requested E.D.L.R. submit to urinalysis testing approximately two to three times a month. E.D.L.R., however, never appeared for the test. On several occasions, E.D.L.R. told Shameka that he was not going anywhere to have his urine tested and that if she wanted a drug test, she could come to his house and do the drug test at the house. Because his parent-child visits were contingent on negative urinalyses, E.D.L.R. had only seen the children face-to-face at court hearings. Shameka further explained that although phone conversations were allowed, DAR's placement stopped the phone calls based on E.D.L.R.'s cursing and inappropriate language.

Finally, Shameka recommended that termination was in the children's best interests. Both girls were diagnosed with behavior and mental issues requiring continued counseling and treatment. They also both suffered from self-harming behaviors and were both on medications for behavior disorders and anxiety. In Shameka's opinion, E.D.L.R. was not sufficiently stable to care for himself, much less his two daughters. Additionally, Shameka testified that E.D.L.R. was aggressive and hostile and that, on several occasions, the girls expressed fear of E.D.L.R.. As for a permanency plan, Shameka testified that the Department was trying to locate relatives and arrange for adoption, if possible.

### 6. *Shelby McCaslin, CASA volunteer*

The next witness called was Shelby McCaslin, the court-appointed child advocate. Shelby agreed with the Department's recommendation for termination. In her opinion, E.D.L.R.'s aggressive and negative behaviors are inappropriate and harmful to the children. As evidence of such aggression, Shelby testified that E.D.L.R. aggressively confronted her during the proceedings and, on one occasion, an argument between E.D.L.R. and his older daughter required the bailiff's involvement. Furthermore, Shelby testified the girls have both expressed that they do not want to be with their father.

**C.      Factors Considered by the Trial Court**

In a bench trial, the trial court is the sole judge of the weight and credibility of the evidence, including the testimony of the Department's witness. *See In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006) (per curiam) (requiring appellate deference to the fact-finder's findings); *City of Keller*, 168 S.W.3d at 819. The factors used to ascertain the best interest of the child were set forth in *Holley*. 544 S.W.2d at 371–72; *accord E.N.C.*, 384 S.W.3d 796, 807 (Tex. 2012) (reciting the *Holley* factors). The *Holley* Court warned that "[t]his listing is by no means exhaustive, but does indicate a number of considerations which either have been or would appear to be pertinent." *Holley*, 544 S.W.2d at 372; *accord In re E.N.C.*, 389 S.W.3d at 807 (describing the *Holley* factors as nonexclusive). "The absence of evidence about some of these considerations would not preclude a fact-finder from reasonably forming a strong conviction or belief that termination is in the child's best interest, particularly if the evidence were undisputed that the parental relationship endangered the safety of the child." *C.H.*, 89 S.W.3d at 27. In fact, evidence of only one factor may be sufficient for a factfinder to form a reasonable belief or conviction that termination is in a child's best interest—especially when undisputed evidence shows that the parental relationship endangered the child's safety. *See id*. There is, however, a strong presumption that keeping a child with a parent is in the child's best interest. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (per curiam).

In addition to consideration of the *Holley* factors, courts remain mindful that "the prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest." TEX. FAM. CODE ANN. § 263.307(a) (West Supp. 2016); *In re B.R.*, 456 S.W.3d 612, 615 (Tex. App.—San Antonio 2015, no pet.). In determining whether a parent is willing and able to provide the child with a safe environment, courts should consider the following statutory factors set out in section 263.307(b) of the Code, which include the following:

(1)     the child's age and physical and mental vulnerabilities;

(2)     the frequency and nature of out-of-home placements;

(3)     the magnitude, frequency, and circumstances of the harm to the child;

(4)     whether the child has been the victim of repeated harm after the initial report and intervention by the department;

(5)     whether the child is fearful of living in or returning to the child's home;

(6)     the results of psychiatric, psychological, or developmental evaluations of the child, the child's parents, other family members, or others who have access to the child's home;

(7)     whether there is a history of abusive or assaultive conduct by the child's family or others who have access to the child's home;

(8)     whether there is a history of substance abuse by the child's family or others who have access to the child's home;

(9)     whether the perpetrator of the harm to the child is identified;

(10)    the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision;

(11)    the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time;

(12)    whether the child's family demonstrates adequate parenting skills; and

(13)    whether an adequate social support system consisting of an extended family and friends is available to the child.

TEX. FAM. CODE ANN. § 263.307(b); *see In re G.C.D.*, No. 04-14-00769-CV, 2015 WL 1938435, at *4 (Tex. App.—San Antonio Apr. 29, 2015, no pet.) (mem. op.) (citing *In re A.S.*, No. 04-14-00505-CV, 2014 WL 5839256, at *2 (Tex. App.—San Antonio Nov. 12, 2014, pet. denied) (mem. op.)); *B.R.*, 456 S.W.3d at 615.

In determining the best interest of a child, courts "may consider circumstantial evidence, subjective factors, and the totality of the evidence as well as direct evidence. *B.R.*, 456 at 616 (citing *In re E.D.*, 419 S.W.3d 615, 620 (Tex. App.—San Antonio 2013, pet. denied)). A factfinder may also measure a parent's future conduct by his or her past conduct to aid in determining whether termination of the parent-child relationship is in the best interest of the child. *Id.* Finally, the

grounds on which the trial court granted termination, pursuant to section 161.001 of the Code, "may also be probative in determining the child's best interest; but the mere fact that an act or omission occurred in the past does not ipso facto prove that termination is *currently* in the child's best interest." *In re O.N.H.*, 401 S.W.3d 681, 684 (Tex. App.—San Antonio 2013, no pet.) (internal citation omitted).

**D.      Analysis of Children's Best Interests**

   *1.      Desires of the Children*

At the time of the termination hearing, the children were fifteen and eleven-years-old. Although the children were not called to testify, both the children's court-appointed advocate and attorney ad litem testified the girls feared their father and did not want to be placed in his care. Although the Department had not been able to find a family placement, the children were doing well in the Department's care. Both girls required medication and counseling. They were both in good standing at school. *See* TEX. FAM. CODE ANN. § 263.307(b)(13); *Holley*, 544 S.W.2d at 371–72. We find the opinions expressed by the children to their advocate and their attorney ad litem weigh in favor of the trial court's termination.

   *2.      Emotional and Physical Needs of the Children*

The evidence further indicates E.D.L.R. was unable to successfully address the negative behaviors addressed by the service plan. *See O.N.H.*, 401 S.W.3d at 684 (concluding trial court permitted to consider parent's past conduct in best interest determination). E.D.L.R. exhibited an aggressive nature and difficulty with impulse control during every step of the process. E.D.L.R.'s inability to view his actions as the basis for the Department's concerns was also an issue. E.D.L.R. expressed little empathy for his children and, instead, viewed himself as a victim of the Department's actions. *See* TEX. FAM. CODE ANN. § 263.307(b)(3), (4), (7); *Holley*, 544 S.W.2d at 371–72. The record also reflects E.D.L.R.'s history of violence toward other individuals,

especially the children's mother. *See* TEX. FAM. CODE ANN. § 263.307(b)(7); *Holley*, 544 S.W.2d at 371–72. The caseworker, the psychologist, and even the children's mother expressed concerns about the domestic abuse witnessed by the children. *See* TEX. FAM. CODE ANN. § 263.307(b)(7); *Holley*, 544 S.W.2d at 371–72.

Even further, there was some question as to why E.D.L.R. was not in court on the day in question. E.D.L.R. missed several previous court settings, but blamed the Department for failing to provide notice of the hearings. All parties understood that the termination hearing was scheduled to make a final determination on whether the trial court would terminate his parental rights. When E.D.L.R.'s mother left the apartment that morning, she fully anticipated E.D.L.R. was meeting her at the courthouse. E.D.L.R.'s assertion that he was unable to attend the hearing due to physical disabilities, was called into question by his mother's description of his condition as a "pulled muscle."

During his testimony, E.D.L.R. downplayed and disputed the abuse allegations; he also placed much of the blame on the Department for his failure to complete his service plan and his failure to appear at the previous status hearings. The trial court was not required to accept E.D.L.R.'s testimony and could have resolved the evidence against E.D.L.R. *See J.L.*, 163 S.W.3d at 85; *J.F.C.*, 96 S.W.3d at 266.

### 3. *Parenting Abilities and Services Available*

With regard to E.D.L.R.'s use of services available to assist him with reunification, the trial court heard testimony that established E.D.L.R. resisted, and even vehemently refused, to utilize most of the services offered by the Department. *See* TEX. FAM. CODE ANN. § 263.307(b)(10); *Holley*, 544 S.W.2d at 371–72. The caseworker testified that a service plan was developed and that she explained to E.D.L.R. the effects of his refusal to comply with the service plan; yet, E.D.L.R. failed to submit to the required drug testing or to attend the required individual

counseling, anger management classes, parenting classes, or domestic violence classes. In fact, E.D.L.R.'s refusal to submit to the drug testing resulted in his inability to see his children during the pendency of the case. *See* TEX. FAM. CODE ANN. § 263.307(b)(10); *Holley*, 544 S.W.2d at 371–72.

Accordingly, based on this evidence, the trial court could have formed a firm belief or conviction that E.D.L.R. failed to work with the Department and did not fully comply with his service plan. *See J.L.*, 163 S.W.3d at 85; *J.F.C.*, 96 S.W.3d at 266. As a result, we find these factors—parenting abilities and utilization of available programs—favor termination.

### 4. *Stability of the Home or Proposed Placement*

The record reflects the children are currently in stable placement facilities; both were working with psychologists and receiving the necessary medications and psychological assistance. *See* TEX. FAM. CODE ANN. § 263.307(b)(13); *Holley*, 544 S.W.2d at 371–72. Although the Department attempted to place the children with their paternal-grandmother, the placement was contingent on E.D.L.R. not living at the residence. There was extensive testimony regarding whether E.D.L.R. would "allow" his mother to move out of the residence they shared. At one point E.D.L.R. testified that his mother could move out at any time; however, during cross-examination he conceded that she could not do so until the lease expired.

E.D.L.R. contends he has maintained a stable home environment for his children and wishes for them to return home. *See* TEX. FAM. CODE ANN. § 263.307(b)(11) (willingness of child's family to effect positive and personal changes); *Holley*, 544 S.W.2d at 371–72. Although E.D.L.R. denied any recent drug use or physical abuse in the home, he has refused to be drug tested and on cross-examination he conceded to an assault conviction where he "grabbed [the children's mother] by the arm or by the hair or something." Additionally, the exchange between E.D.L.R. and his mother regarding whether he will "allow" her to move out of the apartment they are

currently sharing, is also concerning. Given the evidence presented, it was reasonable for the trial court to conclude E.D.L.R.'s home would include an aggressive and abusive atmosphere where the children would endure emotional and physical abuse as well as potentially witness E.D.L.R.'s aggressive acts toward other individuals. *See* TEX. FAM. CODE ANN. § 263.307(b)(3), (4), (7), (11); *Holley*, 544 S.W.2d at 371–72; *see also B.R.*, 456 S.W.3d at 616 (stating factfinder may measure future conduct by past conduct). This factor also weighs in favor of termination.

### 5. *Acts or Omissions of the Parent*

Finally, the trial court heard testimony from several witnesses regarding E.D.L.R.'s anger management and impulse control issues. *See* TEX. FAM. CODE ANN. § 263.307(b)(3), (4), (7), (12)(D), (E); *Holley*, 544 S.W.2d at 371–72. Based on the evidence presented, the trial court—as the sole judge of the weight and credibility of the evidence—could have reasonably concluded that E.D.L.R. exercised poor judgment and lacked the decision-making skills and parental abilities to provide for and parent the children in a healthy and safe manner. *See H.R.M.*, 209 S.W.3d at 108; *City of Keller*, 168 S.W.3d at 819.

The record supports E.D.L.R. was unable to effect the necessary changes within a reasonable time. The trial court found, and E.D.L.R. does not challenge on appeal, that E.D.L.R.

- constructively abandoned the children; and
- failed to comply with the service plan as directed by the trial court.

*See* TEX. FAM. CODE ANN. § 161.001(b)(1)(N), (O). The trial court's determination regarding E.D.L.R.'s termination under section 161.001(b)(1) is properly considered in its findings that termination is in the best interests of the children and is, in fact, probative in determining the children's best interests. *See C.H.*, 89 S.W.3d at 27 (holding the same evidence may be probative of both section 161.001(b)(1) grounds and best interest); *O.N.H.*, 401 S.W.3d at 684.

Reviewing the evidence under the two sufficiency standards, and giving due consideration to evidence that the trial court could have reasonably found to be clear and convincing, we conclude the trial court could have formed a firm belief or conviction that terminating E.D.L.R.'s parental rights to DAN and DAR was in the children's best interests. *See J.L.*, 163 S.W.3d at 85; *J.F.C.*, 96 S.W.3d at 266; *see also H.R.M.*, 209 S.W.3d at 108. Therefore, the evidence is legally and factually sufficient to support the trial court's order. *See J.F.C.*, 96 S.W.3d at 266; *see also H.R.M.*, 209 S.W.3d at 108.

## CONCLUSION

The trial court found E.D.L.R. committed the statutory grounds supporting termination of his parental rights and that termination of E.D.L.R.'s parental rights was in DAN's and DAR's best interests. E.D.L.R. only appealed the best interests of the children finding.

Having reviewed the evidence, we conclude it was legally and factually sufficient to support the trial court's finding by clear and convincing evidence that termination of E.D.L.R.'s parental rights to DAN and DAR was in the children's best interests.

Accordingly, we overrule E.D.L.R.'s sole issue on appeal and affirm the trial court's order.

Patricia O. Alvarez, Justice